

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

DEC 1 5 2017

JAMES W. McCORMACK, CLERK
By:_____
                    DEP CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION 4

Allied World Insurance Company,
a New Hampshire Corporation,

        Plaintiff,

        v.

CMM Mechanical, LLC, an Arkansas
Limited Liability Company; Cary Parks, an
individual; Susan Parks, an individual,
Michael S. Brooks, an individual; and The
Estate of Robert A. Hall, a probate estate in
Pulaski County, Arkansas,

        Defendants.

_____/

CASE NO.

4:17cv 835 KGB

This case assigned to District Judge *Baker*
and to Magistrate Judge *Ray*

## COMPLAINT

Plaintiff, ALLIED WORLD INSURANCE COMPANY, a New Hampshire

Corporation ("Allied World" or "Surety"), sues CMM MECHANICAL, LLC ("CMM" or

"Principal"), Cary Parks, Susan Parks, Michael S. Brooks, and The Estate of Robert A.

Hall (collectively, the "Indemnitors" or "Defendants") and alleges as follows:

### JURISDICTION

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332, on the

basis of diversity of jurisdiction with an amount in controversy over $75,000,

excluding costs, attorneys' fees, and interest.

## VENUE

2. Venue is proper in the United States District Court for the Eastern District of Arkansas, Western Division 4, pursuant to 18 U.S.C. §1965, as all Indemnitors reside, are found, have an agent, or transact affairs within this District.

## PARTIES

3. This is an action for damages in an amount in excess of $75,000, exclusive of costs, attorneys' fees, and pre and post-judgement interest.

4. Allied World is, and at all times mentioned was, a corporation organized and existing under the laws of New Hampshire, with its principal place of business located at 199 Water St. 24th Floor, New York, NY 10038, and is authorized and qualified to conduct surety business.

5. CMM is, and at all times mentioned was, a limited liability company organized and existing under the laws of Arkansas, currently not active, with its last known principal place of business located at 505 Amity Rd., Suite 305, Box 5, Conway, AR 72032 through its last known officer, Cary Parks at 6 Perdido Dr., Little Rock, AR 72211.

6. Cary Parks at 6 Perdido Dr., Little Rock, AR 72211, who is over the age of 18, and a citizen of the State of Arkansas.

7. Susan Parks at 6 Perdido Dr., Little Rock, AR 72211, is over the age of 18 and a citizen of the State of Arkansas.

8. Michael S. Brooks at 34 Bush Ln, Vilonia, AR 72173, is over the age of 18 and a citizen of the State of Arkansas.

2

9. The Estate of Robert A. Hall is a probate estate, filed in Pulaski County, Arkansas Circuit Court Probate Division (60PR-17-1996) for an individual, Robert A. Hall, who was for all times relevant over the age of 18 and a citizen of the State of Arkansas through David J. Wood, 809 West 2nd St, Little Rock, AR 72201, attorney of record for the estate.

10. All conditions precedent to the filing of this action have been satisfied or are hereby waived.

## FACTUAL BACKGROUND

11. CMM approached Allied World to issue a Performance and Payment Bond in connection with a construction project with the State of Arkansas Department of Finance and Administration (hereafter DFA): DFA Division of Building Authority, Bond No.S001-4952: Project No. 6151609 (hereafter, the "Project").

12. Allied World required a promise of indemnity or posting of collateral from CMM, and the other Indemnitors, prior to issuance of any bond.

13. Accordingly, on or about December 16, 2015, the Indemnitors, jointly and severally, executed and delivered an Agreement of Indemnity in favor of Allied World. A true and correct copy of the Agreement of Indemnity is attached hereto, incorporated by reference, and made a part hereof as **Exhibit A (Agreement of Indemnity)**.

14. Pursuant to the Agreement of Indemnity, Allied World received, among other things, the written promise of Indemnitors to indemnify and hold Allied World

harmless from any and all loss, claims, and expense that Plaintiff might sustain as a consequence of executing Payment and Performance Bonds.

15. In particular, under Section 3.2 of the Agreement of Indemnity, Indemnitors agreed to:

> at all times jointly and severally to exonerate, indemnify and keep indemnified, and to defend and to hold Surety harmless from and against any and all liability for any and all Loss, and in such connection, Indemnitors will pay Surety for all Losses specified or otherwise described in Surety's notice, no later than close of business on the Due Date with respect to such notice, whether or not Surety has actually made any payment thereon as of such Due Date.

16. Under Section 3.3(a) of the Agreement of Indemnity, the Indemnitors further agreed:

> [T]o deposit with Surety upon demand as collateral, by the Due Date and after receipt of Surety's written demand an amount determined solely by Surety to exonerate Surety from Loss and to cover its exposure and/or liability for Loss covered by Section 3.2, as determined solely by Surety. At Surety's sole option, such collateral will be in addition to and not in lieu of any other collateral previously provided to Surety. In addition, if an Event of Default (as defined in this Agreement below) has occurred, Surety will be entitled to demand that Indemnitors place with Surety funds equal to the aggregate penal sum of all then-outstanding Bonds, or such sum as determined by Surety in its sole discretion (regardless of whether any actual liability for Loss exists under any of the Bonds)."

17. Under Section 3.3(d) of the Agreement of Indemnity, the Indemnitors further agreed:

> Indemnitors acknowledge that the failure to deposit with Surety, by the Due Date, the sum demanded by Surety as collateral security will cause Surety irreparable harm for which Surety has no adequate remedy at law. Indemnitors agree that Surety will be entitled to injunctive relief for

specific performance of Indemnitors' obligation to deposit with Surety the sum demanded as collateral security and hereby waive any claims or defenses to the contrary and the posting of any bonds by Surety in connection therewith

18. The definition of *Loss* under the Agreement of Indemnity is defined as:

the underlying dollar amount of all Claims and of all damages, expenses, costs, professional and consulting fees (including all legal fees and disbursements), interest and expenses of every nature (including premium and fees due-but-unpaid for the issuance and continuance of the Bonds) which Surety sustains or incurs or becomes liable for by reason of (a) being requested to execute or procure the execution of any Bond; or (b) having executed or procured the execution of any Bond; or (c) the administration of any amendment, waiver or supplement to any Bond; or (d) any Indemnitor's failure to perform or comply with any of the covenants and conditions of this Agreement; or (e) enforcement of, attempted enforcement of, or preservation of rights under any Bond or this Agreement.

19. In reliance on the Indemnitors' execution of the Agreement of Indemnity, Allied World[1] issued a Performance and Payment Bond on a Project for which CMM was the bond principal. Specifically, Allied World issued the following bond: DFA Project: Bond number S001-4952, with a penal sum of $814,000.00, issued in favor of DFA Division of Building Authority ("DFA"), as obligee. See a true and correct copy of the Bond attached hereto, incorporated by reference, and made a part hereof as **Exhibit B, (Performance and Payment Bond)**.

20. An event of default under Section 5.2 of the Agreement of Indemnity includes the following:

---

[1] The bonds were issued by Allied World's underwriter, Druml Group, Inc. d/b/a Direct Surety.

(1) receipt of any vendor non-payment notices, Notice of Intent to default, declaration of default, or termination of Principal's contract, abandonment, breach of or failure, refusal or inability to perform, any contract referred to in the Bonds or of any breach of any said Bonds;

(2) a failure by any Principal or Indemnitor, or delay, refusal, or inability to pay bills or other indebtedness incurred in, or in connection with, the performance of any contract covered by a Bond;

(3) failure to comply with Article III of this Agreement, (which includes posting of collateral upon the Surety's demand); …

(7) Principal's dying, absconding, disappearing, incompetency, being convicted of a felony, or imprisoned if Principal be an individual or, if Principal is any other type of entity, any change in Principal's name, principal place of business or existence.

21. Regarding the Project, CMM began to perform but then failed to fulfill its obligations under the subcontract when it ceased business operations while Project was still in progress.

22. On September 27, 2017, DFA gave notice that CMM unilaterally closed its doors and was no longer prosecuting work, leaving required work uncompleted.

23. Further, various subcontractors have asserted claims or demands for payment against Allied World under the terms of the Performance and Payment Bond following CMM's default on the Project. Specifically, the following are the payment bond claims that have been asserted to date, representing losses, as that term is defined under the Agreement of Indemnity:

   a.   Northwest Controls Systems, Inc. - $130,400

   b.   Daikin Applied Americas, Inc. - $76,547.19

   c.   Express Employment - $8,866.09

    d.  JACO Sales - $34,551

    e.  Searcy Sheet Metal - $18,000

    f.  Fleming Electric, Inc. - $56,352.82

    g.  PVF Industrial Supply, Inc. - $7,950.05

    h.  Airetech Corporation & Northwest Controls Systems - $27,207.59

    i.  Fluid Solutions - $11,356.71

24. In addition to the above payment bond claims, on October 27, 2017, DFA submitted a performance bond claim and, in support thereof, a proof of claim, requesting Allied World to supply a competent and licensed contractor to complete the Project. In the claim, DFA notified Allied World that CMM was terminated from the Project leaving an estimated $262,867.44 in unpaid bills from other subcontractors, suppliers, labor providers, and vendors of CMM, related to the Project. The estimated exposure from DFA's performance bond claim exceeds $400,000.

25. In addition to direct claim losses, Allied World continues to suffer losses under the Bond in the form of loss-adjusting expenses, attorneys' fees, and consultancy fees in pursuing the enforcement of the Indemnitors' obligations under the Agreement of Indemnity.

26. As a result of the above, Allied World has suffered losses and reasonably expects further losses to occur.

27. Pursuant to the terms of the Agreement of Indemnity and, as a result of the above losses, Allied World sent a collateral demand letter to the Indemnitors on or about October 13, 2017, demanding the deposit of $875,000.00 in cash or certified funds by October 23, 2017. To date, the Indemnitors have failed to deposit said collateral.

28. The Indemnitors failure to post collateral constitutes a material breach of the Agreement of Indemnity.

29. Moreover, each of the Indemnitors materially breached and defaulted upon their obligations under the Agreement of Indemnity by failing or refusing to indemnify and reimburse the Surety for the losses paid and by failing or refusing to indemnify and reimburse the Surety for its loss adjusting expenses, attorneys' fees and consultancy fees.

30. Allied World has made repeated attempts to contact CMM, and the indemnitors, to assess the situation, to which the Indemnitors have not adequately responded.

31. Of imminent concern, CMM is no longer an active business entity, its registered agent resigned, and CMM's assets are not accounted for, representing a threat to the collateral security for which Allied World bargained and which formed the basis for Allied World's decision to issue bonds to CMM.  Any sale or distribution of CMM assets will severely prejudice Allied World.

32. In sum, the Indemnitors, joint and severally, owe the Surety the principal amount of $875,000 for claim losses, potential claim losses, and allocated expenses for consulting and legal representation, loss-adjustment expenses, pre-judgement interest

from the date of each disbursement, and the posting of collateral to Allied World to cover Allied World's loss exposure that continues to increase. The Indemnitors, joint and severally, also owe the Surety for any and all losses, costs, expenses, and attorneys' fees, incurred after the filing of this action

## COUNT I – BREACH OF INDEMNITY AGREEMENT

33. Allied World realleges and incorporates by reference Paragraphs 1 through 32.

34. As stated above, the Indemnitors entered into an Agreement of Indemnity with Allied World on or about December 16, 2015.

35. The Agreement of Indemnity provides that the Indemnitors, jointly and severally, will indemnify and hold Allied World harmless for any and all liability for any and all losses incurred.

36. The Indemnitors materially breached the Agreement of Indemnity by (1) failing to post collateral upon the Surety's demand; (2) failing to exonerate Allied World for the losses it has sustained, in the discharge of its obligations as surety, with regard to the claims made against bond numbers S001-4952; (3) failing to indemnify and hold Allied World harmless, for the losses it has sustained, in the discharge of its obligations as surety, with regard to the claims made against bond numbers S001-4952; (3) failing, delaying, refusing, or being unable to pay bills or other indebtedness incurred in, or in connection with, the performance of any contract covered by a bond; and (4) ceasing its business existence.

37. Allied World has performed all conditions to be performed on its part under the

Bond and under the Agreement of Indemnity.

38. As a direct result of the Indemnitors' breach of the Agreement of Indemnity, Allied World has been damaged incurring substantial costs, exclusive of court costs, expenses, and attorneys' fees.

WHEREFORE, Allied World Specialty Insurance Company respectfully requests entry of an order awarding Allied World (1) damages, costs, expenses, pre-judgement interest, attorneys' fees and costs; (2) specific performance pursuant to paragraphs 3.3 and 5.1 of the Agreement of Indemnity for the Indemnitors to immediately post collateral with Allied World or otherwise place Allied World in funds in the amount of all losses, expenses and other obligations in connection with the Project for which Allied World is or may be liable under the Bond; and (3) request that the Court order any such further relief the Court deems just and proper.

## COUNT II – COMMON LAW INDEMNITY/REIMBURSEMENT

39. Allied World realleges and incorporates by reference Paragraphs 1 through 32.

40. A special relationship exists between CMM, as the principal and primary obligor under the Bond, and Allied World, as CMM's surety and the secondary obligor under the Bond.

41. Allied World, the party seeking indemnification, is without fault and has performed its obligations under the Performance and Payment Bond, for which CMM is primarily responsible, by making payments to all valid bond claimants after CMM defaulted.

42. Allied World's liability for the payments on all valid bond claims is vicarious and solely for the wrong of CMM defaulting and failing to make such payments.

43. Allied World has suffered a direct and proximate loss and is entitled to have CMM reimburse Allied World for these losses incurred in the performance of CMM's obligations.

WHEREFORE, Allied World Specialty Insurance Company respectfully requests entry of an order awarding Allied World for (1) damages, costs, expenses, pre-judgement interest, attorneys' fees and any other costs whatsoever relating to performing the bonded obligations or losses, expenses and other obligations in connection with the Project for which Allied World is or may be liable under the Bond; (3) attorneys' fees and costs; and (4) request that the Court order any such further relief the Court deems just and proper.

## COUNT III – EXONERATION

44. Allied World realleges and incorporates by reference Paragraphs 1 through 32.

45. This is an action for exoneration seeking equitable relief.

46. Pursuant to the terms of the Agreement of Indemnity and the doctrine of equitable exoneration, Allied World is entitled to be exonerated by CMM from all losses, costs, and expenses, associated with Allied World's payments on the Bond, including, but not limited to, court costs, fees and expenses of attorneys and adjusters, expenses for procuring or attempting to procure releases from liability under the Bond, and expenses incurred to enforce the Agreement of Indemnity, sustained as a result of issuing the Bond to CMM and pursuing its right of indemnification.

47. The losses, costs, and expenses have become fixed and are due.

48. CMM is liable for payment of the losses, costs, and expenses.

49. In the absence of the equitable relief sought herein, Allied World will not be adequately secured for any obligations that have arisen and may arise hereafter under the Bond, as a result of CMM's breaches of the Agreement of Indemnity, all to the prejudice and irreparable harm of Allied World. Without adequate security, Allied World will be prejudiced because it will be required to advance further funds in connection with claims on the Bond.

50. Allied World seeks entry of a judgment requiring CMM to fully exonerate Allied World from such losses, costs, and expenses.

WHEREFORE, Allied World respectfully requests that the Court order CMM to (1) immediately post collateral with Allied World, or otherwise place Allied World in funds, for losses, expenses and other obligations in connection with the Project for which Allied World is or may be liable under the Bond; and (2) pay attorneys' fees and costs. Allied World further requests any such relief the Court deems just and proper.

## COUNT IV –QUIA TIMET

51. Allied World realleges and incorporates by reference Paragraphs 1 through 32.

52. This is an action for quia timet seeking equitable relief.

53. In addition to the contractual requirement set forth in paragraph 3.3 of the Agreement of Indemnity, Allied World has a common law right to require CMM to post collateral to avoid depletion of CMM's assets to the detriment of Allied World,

and to ensure faithful performance of CMM's obligations.

54. Allied World will be called upon in the near future to pay debts relating to the Bond, the exact amount of which has yet to be determined.

55. The debt includes claims made on the Bond by payment bond claimants or potential claimants and a claim made on the performance bond by DFA, the obligee of the Project, who has given notice of incomplete work by CMM, substantiated by a proof of claim.    Should litigation ensue and DFA prevail, Allied World's loss exposure would soar.

56. CMM is obligated under the doctrine of quia timet to collateralize Allied World for all losses and expenses that Allied World fears or apprehends will be incurred as a consequence of having issued the Bond.

57. Allied World has made demand on CMM to post collateral to guarantee the faithful performance of CMM's obligations.   Despite such demand, CMM has failed and refused to post collateral.

58. In the absence of the equitable relief sought herein, Allied World will not be adequately secured for any obligations that have arisen and may arise hereafter under the Bond and as a result of CMM's breaches of the Agreement of Indemnity, all to the prejudice and irreparable harm of Allied World. Without adequate security, Allied World will be prejudiced because it will be required to advance further funds in connection with claims on the Bond.

59. Unless temporary and continuing injunctive relief is granted, Allied World is

fearful and apprehensive that CMM (a) is or will become financially unable to pay any amounts that may be found owing for which Allied World may be liable and Allied World's related expenses (including attorneys' fees); or (b) will sell, transfer, dispose or, otherwise, conceal their assets based upon the refusal to secure Allied World in accordance with its demands.

60. Unless the relief in the nature herein requested or its equivalent is granted, Allied World's equitable right of quia timet and indemnification will be forever lost, depriving Allied World of adequate security for its obligation to make payments to the obligees and claimants under the Bond.

61. Unless the equitable relief requested below is granted, Indemnitors are likely to sell, transfer, dispose, lien, secure, or otherwise divert their assets from being used to discharge Indemnitors' obligation to hold harmless or exonerate Allied World.

62. Allied World seeks an order requiring CMM to post collateral to avoid depletion of CMM's assets and to ensure faithful performance of CMM's obligations.

WHEREFORE, Allied World respectfully requests that the Court order CMM (1) to immediately post collateral with Allied World or otherwise place Allied World in funds for anticipated losses, expenses and other obligations in connection with the Project for which Allied World is or may be liable under the Bond; and (2) pay attorneys' fees and costs. Allied World further requests any such relief the Court deems just and proper.

## COUNT V – SPECIFIC PERFORMANCE

63. Allied World realleges and incorporates by reference Paragraphs 1 through 32.

64. This is an equitable claim for specific performance to compel performance of an agreement or contract on the precise terms agreed upon.

65. Under the Agreement of Indemnity, Allied World agreed to terms with Indemnitors in paragraphs 3.3 of the Agreement of Indemnity, requiring the Indemnitors to post collateral sufficient to defray losses and expenses in connection with the Bond. The terms of the assignment and conveyance of collateral are further defined at paragraph 5.1 of the Agreement of Indemnity.

66. Allied World has made demand on Indemnitors to post collateral pursuant to the Agreement of Indemnity to guarantee the faithful performance of Indemnitors' obligations.

67. Despite such demand, Indemnitors have failed to satisfy their obligations under the Agreement of Indemnity by refusing to post funds with Allied World sufficient to cover the losses and expenses incurred or expected to be incurred by Allied World. Unless the assets of Indemnitors are provided to Allied World as collateral, Allied World will not be adequately paid, secured or collateralized for potential obligations prior to making any necessary and appropriate payments.

68. By the express provisions of the Agreement of Indemnity, Allied World is entitled to be placed in funds or other collateral security by the Indemnitors upon demand, in an amount that is sufficient to cover all losses and expenses to be incurred as a consequence of its issuance of the Bond.

69. In the Agreement of Indemnity, the Indemnitors agreed that Allied World will be

entitled to injunctive relief for specific performance of Indemnitors' obligation to deposit with Allied World the sum demanded as collateral security and hereby waive any claims or defenses to the contrary

70. In the absence of the equitable relief sought herein, Allied World will not be adequately secured for any obligations that have arisen and may arise hereafter under the Bond and as a result of Indemnitors' breaches of the Agreement of Indemnity, all to the prejudice and irreparable harm of Allied World. Without adequate security, Allied World will be prejudiced because it will be required to advance further funds in connection with claims on the Bond.

71. Unless temporary and continuing injunctive relief is granted, Allied World is fearful and apprehensive that Indemnitors (a) are or will become financially unable to pay any amounts that may be found owing for which Allied World may be liable and Allied World's related expenses (including attorneys' fees); or (b) will sell, transfer, dispose or, otherwise, conceal their assets based upon the refusal to secure Allied World in accordance with its demands.

72. Unless the relief in the nature herein requested or its equivalent is granted, Allied World's equitable right of indemnification will be forever lost, depriving Allied World of adequate security for its obligation to make payments to the obligees and claimants under the Bond or, unless the equitable relief requested below is granted, Indemnitors are likely to sell, transfer, dispose, lien, secure, or otherwise, divert their assets from being used to discharge Indemnitors' obligation to hold harmless or exonerate Allied

World.

WHEREFORE, Allied World respectfully requests that the Court order the Indemnitors (1) to immediately post collateral with Allied World or otherwise place Allied World in funds for anticipated losses, expenses and other obligations in connection with the Project for which Allied World is or may be liable under the Bond; and (2) pay attorneys' fees and costs. Allied World further requests any such relief the Court deems just and proper.

### COUNT VI – RECOVERY OF ATTORNEYS' FEES AND EXPENSES

73. Allied World realleges and incorporates by reference Paragraphs 1 through 32, as if fully set forth.

74. The Surety is entitled to recover its attorneys' fees and expenses from the Indemnitors under the terms of the Agreement of Indemnity.

WHEREFORE, Allied World Specialty Insurance Company respectfully requests entry of an order awarding Allied World damages, costs, expenses, pre-judgement interest, attorneys' fees and costs, and order any such further relief the Court deems just and proper.

Dated: December 15, 2017

Respectfully submitted,

Joseph C. Hoke
Ark. Bar No. 2017201
1214 Clifton Street
Conway, Arkansas 72034
Phone: (501) 563-5851
Email: jchoke8@gmail.com
**Attorneys for Plaintiff**
**Allied World Specialty Insurance Company**

**Exhibit A**

**(Agreement of Indemnity)**

# ALLIED WORLD INSURANCE COMPANY

30 S. 17th St., 16th Floor, Philadelphia, PA 19103

## AGREEMENT OF INDEMNITY

**THIS AGREEMENT OF INDEMNITY** (this *"Agreement"*), is made and entered into on this _14_ day of _DECEMBER_, 20_15_ by and among the following entities and individuals, to wit:

| Principal(s) | Address(es) |
|---|---|
| CMM Mechanical, LLC | 505 Amity Rd, Suite 305 - Box 5, Conway, AR 72032 |

Including any Parent companies, affiliate or subsidiary whether present or future, or directly or indirectly held (all such persons, affiliates and subsidiaries being referred to collectively herein as *"Principal"*) and the following entities and individuals, each intending to be jointly and severally bound hereunder, to wit

| Indemnitor(s) | Address(es) |
|---|---|
| CMM Mechanical, LLC | 505 Amity Rd, Suite 305 - Box 5, Conway, AR 72032 |
| Cary Parks | 6 Perdido Dr, Little Rock, AR 72211 |
| Susan Parks | 6 Perdido Dr, Little Rock, AR 72211 |
| Robert A. Hall | 6 Shore Point, North Little Rock, AR 72116 |
| Michael S. Brooks | 34 Bush Ln, Vilonia, AR 72173 |

CP SP RAH MSB

1

Including any Parent companies, affiliate or subsidiary whether present or future, or directly or indirectly held of any of the foregoing (all such persons, affiliates and subsidiaries being referred to collectively herein, together with Principal, as "*Indemnitors*"), and

Allied World Assurance Company (U.S.), Allied World Insurance Company, Allied World Assurance Company and Darwin National Assurance Company, together with its affiliated insurers and with each other subsidiary, affiliate, successor and assign of any of said insurance companies, which also includes reinsurers, co-sureties, fronting sureties (which are referred to collectively herein as "*Surety*")

# W I T N E S S E T H

WHEREAS, in performing certain contracts and fulfilling related obligations, Principal may be required to obtain surety bonds, or similar undertakings or instruments of guarantee, and to renew, continue or substitute from time to time the same, or to obtain new bonds, undertakings or instruments of guarantee with the same or different penalties, and/or conditions (any one or more of which bonds, undertakings or instruments are hereinafter called a "*Bond*"), and

WHEREAS, acting upon the request of Principal and Indemnitor and in reliance upon the understanding that this Agreement be executed and the obligations hereunder be performed, Surety has agreed to execute Bonds or to cause Bonds to be executed and, in the same reliance, it may in the future execute or cause to be executed, one or more other Bonds on behalf of Principal; and

WHEREAS, Indemnitors have a direct, substantial, material and beneficial interest in obtaining the Bonds and in keeping the Bonds outstanding and in Surety's refraining from canceling said Bonds

NOW THEREFORE, in consideration of these premises, Indemnitors for themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, hereby covenant and agree with Surety as follows:

## I.   Certain Definitions

"*Change of Control*" means any series of events by which (a) a person or group becomes or has the  unconditional right to become the direct or indirect owner, directly or indirectly of 25% or more of the  voting power of the voting stock of any Indemnitor, or (b) an Indemnitor consolidates with or merges into another entity or organization, or transfers by any means all or substantially all of its assets to another entity or organization or (c) during any period of twelve consecutive months, individuals who, at the beginning of such period, constituted the board of directors of an Indemnitor (together with any new director voted to the Indemnitor's board by vote of a majority of the directors then in office who either were directors at the beginning of such period) cease for any reason to constitute at least a majority of the board of directors of such Indemnitor.

"*Claim*" means any claim, notice of default, notice of termination, demand for payment, suit, or any other form of notice or claim or demand that Surety receives in connection with any Bond.

"*Due Date*" will mean the fifth business day after the receipt date of a written demand from the Surety, unless otherwise specified in this Agreement.

"*Interest*" means interest at the rate of four percent (4%) per annum above the Wall Street Journal prime rate, as published on the Due Date, or the greatest amount allowed by law.

"*Lien*" means any mortgage, pledge, assignment, encumbrance, or other security agreement or preferential arrangement of any kind or nature whatsoever.

"*Loss*" means the underlying dollar amount of all Claims and of all damages, expenses, costs,  professional and consulting fees (including all legal fees and disbursements), interest and expenses of every nature (including premium and fees due-but-unpaid for the issuance and continuance of the Bonds) which Surety sustains or incurs or becomes liable for by reason of (a) being requested to execute or procure the execution of any Bond; or (b) having executed or procured the execution of any Bond; or (c) the administration of any amendment, waiver or supplement to any Bond; or (d) any Indemnitor's failure to perform or comply with any of the covenants and conditions of this Agreement; or (e) enforcement of, attempted enforcement of, or preservation of rights under any Bond or this Agreement.

## II.      Representations and Warranties

Indemnitor(s) and each of them hereby represent and warrant to Surety as follows:

2

CP SPR RAH MSB

2.1 No information, exhibit or report furnished by any Indemnitor to Surety in connection with the negotiation of, or compliance with this Agreement or in connection with any Bond, contains or will contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

III.     **Indemnitor Covenants**

Each Indemnitor hereby agrees and covenants with Surety as follows:

3.1      PREMIUMS – to pay Surety, when due or otherwise promptly upon Surety's demand, all of the premiums, costs and charges for Bonds requested from and/or issued by Surety in accordance with its rate filings, its manual of rates, or as otherwise agreed upon; and where such premium costs and charges are annual, to continue to pay them at the then applicable rate (as such rate is set forth by Surety) until Indemnitors or Principal will deliver evidence satisfactory to Surety of its discharge or release from Bonds and all liability by reason thereof.

3.2      INDEMNITY – at all times jointly and severally to exonerate, indemnify and keep indemnified, and to defend and to hold Surety harmless from and against any and all liability for any and all Loss, and in such connection, Indemnitors will pay Surety for all Losses specified or otherwise described in Surety's notice, no later than close of business on the Due Date with respect to such notice, whether or not Surety has actually made any payment thereon as of such Due Date.

Principal's and Indemnitors' joint and several obligations to exonerate, indemnify, and keep indemnified, and to defend and hold harmless Surety from any and all liability for any and all Loss includes but is not limited to: liability, loss, costs, damage and expense of whatsoever kind or nature (including but not limited to interest, court costs, attorney fees, investigation fees, consulting fees, accounting fees, and other professional or trade fees whether incurred on a flat fee, percentage, time and material, hourly or other basis, and includes the cost of Surety's in-house professionals). Surety shall at all times has the right, but not the obligation, to retain counsel of its choice to defend itself from any claim, lien, levy, liability, suit or judgment brought against Surety on any Bond or against any collateral held by Surety, contract funds, trust funds or liens held by Surety. The costs associated with Surety retaining such counsel shall be included within Indemnitors obligation to exonerate, indemnify, and hold Surety harmless.

3.3      DEPOSIT OF FUNDS – (a) to deposit with Surety upon demand as collateral, by the Due Date and after receipt of Surety's written demand an amount determined solely by Surety to exonerate Surety from Loss and to cover its exposure and/or liability for Loss covered by Section 3.2, as determined solely by Surety. At Surety's sole option, such collateral will be in addition to and not in lieu of any other collateral previously provided to Surety. In addition, if an Event of Default (as defined in this Agreement below) has occurred, Surety will be entitled to demand that Indemnitors place with Surety funds equal to the aggregate penal sum of all then-outstanding Bonds, or such sum as determined by Surety in its sole discretion (regardless of whether any actual liability for Loss exists under any of the Bonds).

(b) If Indemnitors fail to pay in full the amount demanded pursuant to this Agreement on the Due Date, Indemnitors will pay Interest on such overdue amount from the Due Date up to the date of actual payment to Surety.

(c) Surety will have the right to use the collateral, or any part thereof, in payment or settlement of any liability, Loss or expense for which Indemnitors are or would be obligated to indemnify Surety under the terms of this Agreement. Indemnitors will be entitled to the refund of any unused portion of the deposit upon termination of the liability of Surety on all Bonds and the termination of Indemnitors' performance of all obligations to Surety under the terms of this Agreement.

(d) Indemnitors acknowledge that the failure to deposit with Surety, by the Due Date, the sum demanded by Surety as collateral security will cause Surety irreparable harm for which Surety has no adequate remedy at law. Indemnitors agree that Surety will be entitled to injunctive relief for specific performance of Indemnitors' obligation to deposit with Surety the sum demanded as collateral security and hereby waive any claims or defenses to the contrary and the posting of any bonds by Surety in connection therewith

(e) Surety shall have no duty to invest, or provide interest specific to any funds pledged by Principal or Indemnitors.

3.4      NEGATIVE PLEDGE —to not create, incur, or suffer to exist any Lien in, of or on any Indemnitors' or Principal's property except as where Surety has provided prior written consent, such consent shall not be unreasonably withheld.

3.5      CHANGE OF CONTROL – to not permit any Change of Control to occur without Surety's prior written consent, such consent not to be unreasonably withheld or denied.

3

CP___ SP___ RAH___ SB

3.6     REPORTING/RIGHT TO INFORMATION – to maintain a system of accounting established and administered in accordance with United States generally accepted accounting principles ("GAAP") and until such time as the potential liability of Surety under any Bond or Bonds is terminated, the Indemnitors and its subsidiaries will promptly furnish to Surety such information as Surety may request from time to time, and Surety will have the right to examine and copy the books, records and accounts of Indemnitors, whether kept in hard copy or electronic format or any combination thereto.  Indemnitors also expressly authorize Surety to access its/his/her/their commercial and personal consumer credit records/profiles (including from TransUnion, Experian, and Equifax) at any time for any reasonable business purpose, including but not limited to, account numbers and account balances from any and all financial institutions, banks, depositories, accountants, creditors, or other persons or firms.

Further, Indemnitors will furnish to Surety:
        3.6.1     Within 10 days of such event, (i) notice of any modification, change, amendment or termination of any credit facility agreements, (ii) notice of any technical or other default under any credit facility agreements as soon as possible and within 10 days of the occurrence thereof, whether or not such default has been waived or cured, (iii) notice of delivery of any certificate or notice required to be delivered by any Indemnitor to lenders or agents under any credit facility agreements to which any Indemnitor is party;

        3.6.2     As soon as possible and within 10 days after Indemnitors' receipt thereof, a copy of (i) any notice or claim to the effect that Indemnitors or any of its subsidiaries is or may be liable to any person as a result of the release by Indemnitors, any of its subsidiaries or any other Person of any toxic or hazardous waste or substance into the environment, and (ii) any notice alleging any violation of any federal, state or local environmental, health or safety law or regulation by Indemnitors or any of its subsidiaries; and

        3.6.3     Upon becoming aware of any demand, notice or proceeding which may result in liability to Surety under any Bond, Principal and Indemnitors will provide notice promptly thereof. Such notices will include, but are not limited to vendor non-payment notices, Notices of Intent to default, default notices, Notices to Cure, termination notices, termination letters, bank notices, and environmental notices of default. Indemnitors further authorize any bank, depository, creditor, Obligee of a Bond, subcontractor, materials supplier or other person, firm or corporation possessing records or having information concerning the financial affairs and operations of Indemnitors to furnish to Surety and its representatives or consultants any such records or information requested by Surety.  The obligations of Principal's and Indemnitors' obligations to furnish the aforementioned information shall be continuing. Surety may, but shall not be obligated to, demand compliance with these reporting requirements at any time.

        3.6.4.     Principal and Indemnitors hereby authorize Surety to furnish any information and/or documents to any other persons, firms, corporation or entities for the following purposes: (a) to fulfill Surety's government and insurance reporting requirements under any applicable laws, rules and regulations, or to provide information to insurance industry associates and/or rating services; (b) to procure or attempt to procure co-suretyship or reinsurance; or (c) to avoid or defend against any Loss or to prosecute any rights as outlined in this Agreement.

3.7     COOPERATION WITH INVESTIGATION – to promptly, upon receipt of a notice from Surety regarding Surety's investigation of a Claim, or upon receipt of a request for additional information from Surety regarding any Claim, provide Surety with access to full, complete, accurate and up to date information regarding Indemnitor's position regarding the validity or defenses to the Claim. If Indemnitors' attorney possesses information concerning the Claim, Indemnitors will instruct its attorney to cooperate with Surety and Indemnitors will provide Surety with access to said attorney and information.

3.8     TRUST FUND —to hold as a trust fund and/or as a constructive or equitable trust, all interest, title and rights in any contract or undertaking referred to in any Bond, or in, or arising in any manner out of, any Bond, including but not limited to payments for or on account of any contract, in which Surety has an interest, which will inure to Surety's benefit for any liability for Loss it may have or sustain under any Bond; and, further, it is expressly declared that all monies due or to become due under any contract covered by any Bond are trust funds, whether in Indemnitors' possession or otherwise, for the benefit of and for payment of all such obligations in connection with any such contract for which Surety may be liable under any Bond; said trust also inures to Surety's benefit for any liability or Loss it may have or sustain under any Bond or under this Agreement, and this Agreement constitutes notice of such trust. Principal and Indemnitors hereby each agree, in both their individual and corporate capacities, to be fiduciaries with respect to the trust funds mentioned herein.

 Upon demand of Surety, Indemnitors shall cause all funds or proceeds from bonded projects received, or to be received in the future, to be deposited into separate trust accounts with a bank or similar depository designated solely by Surety, and such accounts shall be controlled by an escrow agent or disbursing servicer to be designated solely by Surety.  All funds so deposited shall be trust funds for Surety's benefit. Indemnitors shall be liable for the costs of establishing said accounts and for any fee(s) charged by the escrow agent or disbursing servicer over the lifetime of the bonded project(s).

This provision, as well as all provisions of this Agreement, shall not be construed as to create liability of Surety to any third parties claiming to be beneficiaries.

4

CP SPRAH RAH MSB

3.9     SURETYSHIP COVERED – Each Indemnitor expressly recognizes and covenants that this Agreement is a continuing obligation and that it will continue to apply to and indemnify Surety as to any and all Bonds (whether or not covered by any application signed by an applicant with such application to be considered merely supplemental to this Agreement) heretofore or hereafter executed or caused to be executed by Surety on behalf of such applicant until this Agreement will be canceled in the manner hereinafter provided.

IV.      **Settlements, Use of Collateral and Payment**

4.1     SETTLEMENTS -    Surety shall have the full and exclusive right, in its name and in the name of Principal and all Indemnitors, but not the obligation, to prosecute, compromise, release or otherwise resolve any claim(s), causes of action or other rights assigned to Surety in Section V. below, upon which terms as Surety, in its sole discretion, shall deem appropriate. Surety shall have the exclusive right in its name or in the name of Principal and all Indemnitors to adjust, settle, or compromise any Claim, counterclaim, demand, suit or judgment involving any Bond or to take whatever other action it may deem necessary, expedient, or appropriate. Surety's decision with respect to all subject matters related to this Section, shall be binding on Principal and all Indemnitors. Surety shall have the right, but not the obligation, to provide prior notice of any Settlement to Principal and Indemnitors.

4.2     USE OF COLLATERAL - Upon the occurrence of an Event of Default (as defined below), Surety will have the right to use any collateral, or any part thereof, including but not limited to any letter of credit, in payment or settlement of such liabilities for which Indemnitors (or any one of them) would be obliged to indemnify Surety under the terms of this Agreement whether or not such liabilities arise out of or in connection with the Bond under which such collateral was delivered. Surety may sell any property assigned to it pursuant to this Agreement at public or private sale, with or without notice, at any time or place without incurring any liability of any kind. Surety may purchase any of the property at such sale and Indemnitors hereby waive any objection to Surety's purchase as aforesaid.

4.3     PAYMENTS - In the event of any Loss payment by Surety, Indemnitors further agree that in any accounting between Surety and Indemnitors, Surety will be entitled to charge for any and all disbursements made by it in good faith concerning the matters contemplated in this Agreement under the belief that it is, or was, or might be liable for the sums and amounts so disbursed or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed; and that the vouchers or other evidence of any such payments Surety made will be prima facie evidence of the fact and amount of Surety's liability.

V.      **Assignment, Events of Default, Advances, Attorney-in-Fact**

5.1     ASSIGNMENT; COLLATERAL

5.1.1     Each Principal and Indemnitor hereby assigns, transfers, pledges, conveys and sets over to Surety, as collateral to secure every obligation under this Agreement, whether such obligation has arisen before or after the date of this Agreement (with the assignment of any contract to become effective as of the date of the Bond covering such contract), a security interest in the following, whether now owned or hereafter existing or acquired:

   (a)   all of Principal's and/or Indemnitors' rights, title and interest in, and arising in any manner out of, all contracts referred to in the Bonds (whether or not bonded), or in, or arising in any manner out of the Bonds;

   (b)   any and all sums that may be due or hereafter become due on account of any and all contracts referred to in the Bonds including, but not limited to, all percentages retained, progress payments, deferred payments, compensation for extra work and proceeds of damage claims;

   (c)   all of Principal's and/or Indemnitors' rights, title and interest in and to all machinery, supplies, equipment, plant, tools and materials of every nature and description which are now, or may hereafter be, about or upon the site or sites of any and all of the contractual work referred to in the Bonds or elsewhere, including materials purchased for or chargeable to any and all contracts referred to in the Bonds, materials which may be in process of construction, in storage elsewhere, or in transportation to any and all of said sites. Without waiver of the foregoing, it is expressly agreed that should Surety pay the Bond claim of any material supplier, it is expressly agreed that title to all such material and inventory paid for by Surety shall immediately transfer to Surety;

   (d)   all proprietary systems, software and software licenses, patents, copyrights, trademarks, trade secrets, or any other intellectual property or assets of a similar nature which are employed by Principal in connection with any and all contractual work referred to in the Bonds;

(e) all of Principal's and/or Indemnitors' rights, title and interest in and to all subcontracts let or to be let in connection with any and all contracts referred to in the Bonds, and in and to all surety bonds supporting such subcontracts;

(f) all actions, causes of actions, claims and demands whatsoever which Principal and/or Indemnitors may have or acquire against any obligees or bonds, design professionals, prime contractors, subcontractors, laborers or materialmen or any person furnishing or supplying labor, materials, supplies, machinery, tools, inventory or other equipment in connection with or on account of any Contract and against a surety of any obligee, subcontractor, laborer or materialmen, and all monies due or to become due to Principal on any policy of insurance relating to any claims arising out of performance of any Contract, including but not limited to, claims under builders risk, fire, employee dishonesty, workers compensation insurance policies, including premium refunds;

(g) all goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents, accounts, chattel paper, deposit accounts, letter-of-credit rights, securities and all other investment property, supporting obligations, any contract rights or rights to the payment of money (including without limitation with respect to all contracts covered by the Bonds), federal and state tax returns, insurance claims and proceeds, and all general intangibles; and

(h) all products and proceeds of the foregoing.

5.1.2    The foregoing assignment is effective as of the date of this Agreement's execution and delivery as to each contract covered by Bonds executed prior to such date, although nothing herein limits Surety's right to claim under any prior assignment. As to any Bond executed and delivered on or after the date of this Agreement's execution and delivery, the assignment will be effective as of the respective Bond's effective date.

5.1.3    From time to time as circumstances so require, Surety reserves the right, in its sole discretion, to require collateral in addition to any collateral previously deposited with Surety, or as otherwise outlined in this Agreement. The amount of such additional collateral shall be designated by Surety, in its sole discretion. Principal and Indemnitors shall be obligated to provide such additional collateral immediately upon demand by Surety. Surety has the sole discretion to determine whether collateral already in its possession is adequate.

5.2    EVENTS OF DEFAULT – Surety, or any persons Surety designates, may enforce the security interests granted herein and may take, and are hereby authorized and empowered by each Principal and each Indemnitor to take, any action necessary to obtain possession of the funds, rights and property subject thereto if any of the following occur (each an "Event of Default"):

(1) receipt of any vendor non-payment notices, Notice of Intent to default, declaration of default, or termination of Principal's contract, abandonment, breach of or failure, refusal or inability to perform, any contract referred to in the Bonds or of any breach of any said Bonds;

(2) a failure by any Principal or Indemnitor, or delay, refusal, or inability to pay bills or other indebtedness incurred in, or in connection with, the performance of any contract covered by a Bond;

(3) any breach of an obligation set forth in Article III of this Agreement;

(4) any Indemnitor's assignment for the benefit of creditors, or of the appointment, or of any application for the appointment, of a receiver or trustee for any Indemnitor or its property, whether insolvent or not, or any Indemnitor's application for reorganization or arrangement under the terms of the United States Bankruptcy Code or any similar laws of any state, possession or territory of the United States, voluntarily or involuntarily;

(5) any proceeding which deprives Principal of, or interferes with, the use of any machinery, equipment, plant, tools, or material;

(6) any default under any credit facility agreement of any kind which is not waived by the lenders or any contracting party thereto;

(7) Principal's dying, absconding, disappearing, incompetency, being convicted of a felony, or imprisoned if Principal be an individual or, if Principal is any other type of entity, any change in Principal's name, principal place of business or existence; or

(8) the failure of Principal or Indemnitors to pay any Premium(s) on any Bond(s).

6

CP____ SP____ RAH____ MSB

5.3     TAKEOVER – if an Event of Default occurs, Surety will have the option in its sole discretion, and Principal and Indemnitors hereby authorize Surety, to take possession of any part or all of the work under any contract or contracts covered by any Bond, including, but not limited to, machinery, supplies, equipment, plant, tools and materials, wherever stored or located, without charge and at Principal's and/or Indemnitors' cost and expense, to complete or arrange completion of the same, and the Indemnitors will promptly upon demand pay to Surety all Losses, fees, costs and expenses so incurred.

5.4     ADVANCES–Surety is authorized and empowered (in its sole discretion and without any obligation to do so) to guarantee loans, to advance or lend to Principal any money for any contracts referred to in or guaranteed by the Bonds; and all money Surety expends in the completion of any such contracts, or lends or advances from time to time to Principal, or Surety guarantees for the purposes of any such contracts, and all costs, and expenses Surety incurs in relation thereto, unless repaid with legal interest by Principal to Surety when due, will be a Loss by Surety for which Principal and Indemnitors will be responsible, notwithstanding that said money or any part thereof should not be so used by Principal.

5.5     ATTORNEY-IN-FACT – Principal and Indemnitors hereby irrevocably nominate, constitute, appoint and designate Surety, or any persons Surety designates, as their attorney-in-fact with the right, but not the obligation, to exercise all of Principal's and Indemnitors' rights assigned, transferred and set over to Surety in this Agreement, and in Principal's and Indemnitors' name to make, execute, and deliver any and all additional or other assignments, documents, financing statements or papers Surety deems necessary and proper to (i) vest in Surety absolute title to any and all monies, property and rights hereby assigned and (ii) provide the protection and rights to Surety contemplated by all of the provisions of this Agreement. Principal and Indemnitors hereby ratify and confirm all of Surety's acts and actions taken and done as such attorney-in-fact and agree to protect and hold Surety harmless for acts herein granted as attorney-in-fact.

## VI.     Termination

6.1     *Immediately upon receipt of Surety's written request for its release and discharge from any Bond (or Bonds), Indemnitors will use their best efforts to cause Surety to be fully and completely released and discharged from such Bond(s) and from all liability by reason of such Bond(s).*

6.2     Principal or Indemnitors may terminate this Agreement upon thirty days written notice sent by registered mail to Surety at its principal bond office at **30 S. 17th St., 16th Floor, Philadelphia, PA 19103**, but any such notice of termination will not operate to modify, bar, or discharge Principal or Indemnitors as to:

(a) Bonds that may have been theretofore executed or Losses theretofore incurred

Such notice of termination will operate only with respect to Principal or those Indemnitors upon whose behalf such notice of termination will have been given, and such termination will only be effective upon receipt by Surety. All other notices or certificates required to be delivered hereunder should also be sent to Surety.

## VII. General Provisions

7.1     WAIVER BY PRINCIPAL AND INDEMNITORS – With respect to any and all of the powers granted to Surety by this Agreement, whether in this Section or elsewhere, or by operation of law, Principal and Indemnitors hereby EXPRESSLY WAIVE any and all right to claim against Surety, including claims whether future known or unknown, suspected or unsuspected, anticipated or unanticipated, fixed or contingent, that Surety in any way damaged Principal and/or Indemnitors, or any of them, or any of their businesses by the fact that:

7.1.1     Surety failed to exercise any or all of its powers, or failed to exercise any power to the fullest extent it might have;
7.1.2     Surety's acts or omissions interfered with any contract of Principal or damaged the reputation or financial condition of any Indemnitor or his business; or
7.1.3     Surety's acts or omissions increased the liability of Principal or Indemnitors hereunder beyond what Indemnitors or any of them might consider necessary or reasonable or beyond what any of them might have intended to assume.

Principal and Indemnitors hereby ratify and approve all actions and courses of action taken by Surety or its agents in good faith under the power granted herein or otherwise and hereby RELEASE and DISCHARGE Surety and its agents from any and all liabilities.

Indemnitors further agree that they are primarily (not secondarily) liable to Surety under this Agreement. Indemnitors hereby waive and relinquish all rights and remedies which they may be accorded by applicable law to Indemnitors and agrees not to assert or take

7

CP  SP  RAH  MSB

advantage of any such rights or remedies, including, without limitation: (a) any defense based upon any legal incapacity, disability, discharge, or limitation of liability or other defense of Indemnitor, any other guarantor or any other person from any cause other than full payment of all obligations arising out of the Loan, or; (b) any defense based upon Surety's election of any remedy against Indemnitors or both; (c) any right to require Surety to proceed against Indemnitors or any other person or to proceed against or exhaust any remedy in Surety's power before proceeding against Indemnitors; (d) any defense based upon the modification, renewal, extension or other alteration of any of the Surety Agreements; (e) any defense based upon or arising out of any defense which any Indemnitor or other person may have to the performance of any part of the obligations herein agreed to; (f) any defense based upon Surety's failure to disclose to any Indemnitor any information Surety may now or hereafter possess concerning Indemnitors' financial condition or any other circumstances bearing on Indemnitors' ability to pay any of the obligations, regardless of whether Surety has reason to believe that any such information materially increases the risk beyond that which Indemnitors intends to assume or has reason to believe that such information is unknown to Indemnitors or has reasonable opportunity to communicate such information to Indemnitors, since Indemnitors each acknowledge that they are fully responsible for being and keeping informed of the financial condition of the Contractors and Indemnitors and of all circumstances bearing on the risk of non-payment of any Indebtedness hereby created; (g) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in any other respects more burdensome than that of a principal; (h) any right of subrogation, any right to enforce any remedy which Surety may have against Indemnitors and any right to participate in, or benefit from, any Collateral for the obligations now or hereafter held by Surety.

In the Event of Default as defined by this Agreement: (a) Surety may collect from Indemnitors pursuant to this Agreement without first foreclosing on any of the Collateral; (b) if Surety forecloses on any Collateral: (i) the amount of the indebtedness may be reduced only by the amount for which that Collateral is liquidated, even if the Collateral is worth more than the amount received; (ii) Surety may collect from Indemnitors even if Surety, by foreclosing on the Collateral, has allegedly destroyed any right Indemnitor may have to collect from the other Indemnitors. This is an unconditional and irrevocable waiver of any rights and defenses Indemnitors may have because the Indebtedness is secured by Collateral. Indemnitors hereby waive all rights and defenses arising out of an election of remedies by Surety, even though that election of remedies may have destroyed Indemnitors' right of subrogation and reimbursement against the other Indemnitors, if any.

7.2     AMENDMENTS – This Agreement may not be changed or modified orally. No change or modification will be effective unless made by written endorsement executed by Surety to form a part hereof. The addition to this Agreement of any Indemnitor or Principal, including any entities acquired after the date of execution of this Agreement, may be effected by written amendment executed by such Indemnitor or Principal only, notwithstanding any language herein to the contrary.

7.3     CHANGES; WAIVER OF NOTICE –Surety is authorized and empowered, without notice to or knowledge of Indemnitors (any notice to Indemnitors being hereby *expressly waived*), to assent, or to refuse to assent, to any change whatsoever in the Bonds, and/or any contracts referred to in the Bonds, and/or in the general conditions, plans and/or specifications accompanying said contracts, including, but not limited to, any change in the time for the completion of said contracts and to payments or advances thereunder before the same may be due, and to assent, or to refuse to assent, to or take any assignment or assignments, to execute or consent to the execution of any continuations, extensions or renewals of the Bonds and to execute any substitute or substitutes therefor, with the same or different conditions, provisions and obligees and with the same or larger or smaller penalties, it being expressly understood and agreed that Indemnitors will remain bound under the terms of this Agreement even though any such assent by Surety does or might substantially increase the liability of said Indemnitors.

7.4     NO WAIVER BY SURETY; REMEDIES CUMULATIVE – No failure or delay on the part of Surety in the exercise of any power, right or privilege hereunder or under any Bond will impair such power, right or privilege or be construed to be a waiver of any default or to be acquiescence therein, and no single or partial exercise of any such power, right or privilege will preclude further exercise thereof or of any other power, right or privilege. The rights, powers and remedies given to Surety hereby are cumulative and will be in addition to and independent of all rights, powers and remedies existing by virtue of any statute or rule of law, including every right and remedy which a personal surety without compensation would have and nothing herein contained will be considered or construed to waive, abridge or diminish any right or remedy which Surety might have if this Agreement were not executed.

7.5     SET OFF – Surety shall enjoy all of its common law, equitable and statutory rights of set-off, and Principal and Indemnitors expressly agree to Surety's right of set-off. These rights shall include, but not be limited to, Surety's option to withhold for the purposes of set-off any moneys due to Principal or Indemnitors under any and all Bonds and/or Bonded contracts up to any amounts due and owing to Surety. Surety's set-off rights shall apply without limitation, including to all collateral and other property pledged to Surety. Surety shall exercise its set-off rights in the first place, with any other indebtedness second.

7.6     HOMESTEAD WAIVER – Principal and Indemnitors hereby waive all rights to claim any of their property, including their respective homesteads, as exempt from levy, execution, sale or other legal process under the laws of any State, Commonwealth, Territory, or Possession of the United States, except as provided in Section 7.10 of this Agreement.

7.7     COUNTERPARTS – This Agreement may be executed in any number of counterparts, all of which taken together will constitute one agreement, and any of the parties hereto may execute this Agreement by signing any such counterpart. This Agreement will be effective as to each Indemnitor when such Indemnitor has executed it and notified Surety by facsimile transmission that it has taken such action. Indemnitors hereby acknowledge that the failure of anyone of them to execute this Agreement will not in any way affect the validity or enforceability of this Agreement as to those Indemnitors who have executed the Agreement.

7.8     ENTIRE AGREEMENT –This Agreement (together with any Bonds issued by Surety on behalf of a Principal and any other documents delivered in connection herewith or therewith) constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and verbal, among the parties or any of them with respect to the subject matter hereof. This Agreement is between sophisticated parties, each of which has reviewed the Agreement and is fully knowledgeable about its terms and conditions. The parties therefore agree that this Agreement will be construed without regard to the authorship of the language and without any presumption or rule of construction in favor of either of them.

7.9     DECLINE EXECUTION – *All parties acknowledge and agree that nothing in this Agreement will be construed as an explicit or implicit commitment by Surety to execute, renew or extend any bonds to a Principal or otherwise.* Surety may, in its sole discretion, decline to execute, renew or extend any Bond and may cancel any Bond for whatever reason, in Surety's sole discretion, and Principal and Indemnitors agree to make no claim to the contrary.  Without limiting the foregoing, if Surety will execute a Bid or Proposal Bond, it will retain the right to decline to execute any Bond that may be required in connection with an award that may be made under the proposal for which the Bid or Proposal Bond is given, and such declination will not diminish or alter the liability that may arise by reason of having executed the Bid or Proposal Bond. Indemnitors acknowledge that Surety makes no representation as to the validity or acceptability of any Bond to any person, firm or entity of whatever sort or kind under any contract, and Indemnitors agree that they will have no claim against Surety arising out of or in any manner relating to the failure or refusal of any person, firm or entity of whatever sort or kind to award any contract to Principal, or to accept any bond executed and delivered by Surety, or that Surety has been requested to execute and deliver.

7.10    INVALIDITY; SAVINGS CLAUSE – Invalidity of any provision of this Agreement by reason of the laws of any jurisdiction will not render the other provisions hereof invalid. In case any of the parties mentioned in this Agreement fail to execute the same, or in case the execution hereof by any of the parties be defective or invalid for any reason, such failure, defect or invalidity will not in any manner affect the validity of this Agreement or the liability hereunder of any of the parties executing the same, but each and every party so executing will be and remain fully bound and liable hereunder to the same extent as if such failure, defect or invalidity had not existed.  Each party agrees to execute promptly any documentation necessary to cure any such failure, defect or invalidity. It is understood and agreed by the Indemnitors that the rights, powers, and remedies given Surety under this Agreement will be and are in addition to, and not in lieu of, any and all other rights, powers, and remedies which Surety may have or acquire against Indemnitors or others whether by the terms of any other agreement or by operation of law or otherwise.

7.11    GOVERNING LAW; JURISDICTION -This Agreement will be governed by and construed in accordance with the laws of the State of New York without regard to conflict of laws principles. As to any legal action or proceeding related to this Agreement, Indemnitors will be subject to the jurisdiction of the federal courts, or if such courts do not have jurisdiction then the state courts, located in the Borough of Manhattan in the State of New York, and waive any claim or defense in any such action or proceeding based on any alleged lack of personal jurisdiction, improper venue, forum non conveniens or similar basis. Indemnitors further waive personal service.

7.12    NOTICE OF EXECUTION - Principal and Indemnitors hereby waive notice of the execution of any Bond and of the acceptance of this Agreement, and also waive notice of any change in surety credit or other fact that might materially alter Principal's and Indemnitors' obligations hereunder.  Principal and Indemnitors hereby further waive all notice of any default, or any other act or acts giving rise to any claim under said Bonds, as well as notice of any and all liability of Surety under said Bonds, and any and all liability on their part hereunder, to the end and effect that, Principal and Indemnitors will be and continue to be liable hereunder, *notwithstanding* any notice of any kind to which they might have been or be entitled, and *notwithstanding* any defenses they might have been entitled to make as a result of lack of notice.

7.13    OTHER INDEMNITY - Principal and Indemnitors will continue to be bound under the terms of this Agreement even though Surety may have from time to time heretofore or hereafter, with or without notice to or knowledge of Principal and the Indemnitors, accepted, reduced or released other agreements of indemnity or collateral in connection with the execution or procurement of said Bonds, from Principal or Indemnitors or others, it being expressly understood and agreed by Principal and Indemnitors that any and all other rights which Surety may have or acquire against Principal and Indemnitors and/or others under any such other or additional agreements of indemnity or collateral will be in addition to, and not in lieu of, the rights afforded Surety under this Agreement. No Indemnitor will make any defense to the enforcement of this Agreement based on the addition or the release of any Indemnitor. The



security interest, assignments, trust, indemnity and other rights granted herein, will not be deemed a waiver of Surety's equitable subrogation rights or other rights, said security and rights being in addition to the rights of exoneration, subrogation, and other rights to which Surety is entitled to under law or in equity.

7.14    SUITS —Separate suits may be brought hereunder as causes of action accrue, and the bringing of suit or the recovery of judgment upon any cause of action will not prejudice or bar the bringing of other suits, upon other causes of action, whether theretofore or thereafter arising.

7.15    WAIVER OF JURY TRIAL – Principal and Indemnitors hereby waive and convenant that they will not assert any right to trial by jury in respect to any legal proceeding arising out of this Agreement.

7.16    CO-SURETIES – In the event Surety procures the execution of any Bond by other sureties, or executes any Bond with co-sureties, or reinsures any portion of any Bond with reinsuring sureties, then all the terms and conditions of this Agreement will inure to the benefit of such other sureties, co-sureties and reinsuring sureties, their successors and assigns, as their interests may appear.

7.17    UNIFORM COMMERCIAL CODE – This Agreement will constitute a Security Agreement to Surety and also a Financing Statement, both in accordance with the provisions of the Uniform Commercial Code of every jurisdiction wherein such Code is in effect and may be so used by Surety without in any way abrogating, restricting or limiting the rights of Surety under this Agreement or under law, or in equity. Indemnitors will execute and deliver such other instruments as may be necessary or desirable to permit either the filing of this Agreement as a Financing Statement or the filing of a Financing Statement based upon this Agreement as a Security Agreement in such jurisdictions as Surety will deem necessary or desirable. Each Indemnitor hereby authorizes Surety to make such filings, including continuation statements and amendments thereto, without the signature of such Indemnitor.  At Surety's request, Indemnitors additionally agree to sign all other documents that are necessary to perfect, protect, and continue Surety's security interest in the Collateral. Indemnitors additionally agree to sign all supporting documents and other documents that are necessary to perfect, protect, and continue Surety's Lien in the Collateral.  This includes, without limitation, that Indemnitors shall execute and deliver all necessary deposit control account agreements, investment account control agreements, limited liability company membership interest pledge agreements, among others reasonably necessary to perfect Surety's interests in the Collateral, and cooperate and take all necessary and reasonable steps to assure that the appropriate recipient parties on notice of Surety's Lien in the Collateral have accepted notice of the Lien and duly recorded such Lien. Indemnitors further agree to deliver all original promissory notes, vehicle title certificates, and any and all stock, membership or other equity ownership certificates as may be required to give Surety possession and/or control of the Collateral to perfect Surety's security interests.

**IN WITNESS WHEREOF**, the undersigned expressly recognize and covenant that this Agreement is a continuing obligation applying to and indemnifying Surety as to any and all Bonds heretofore or hereinafter executed by Surety on behalf of Principal until this Indemnity Agreement will be terminated.

## PRINCIPAL:

Corporate/Partnership Name:      CMM Mechanical, LLC
_____ (Seal)

FEIN:      ████████

_On behalf of all Principals (if more than one)_

BY:      _[signature]_
_____

Name & Title      Cary Parks, President
_____

## INDEMNITOR(S):

Corporate/Partnership Name:      CMM Mechanical, LLC
_____ (Seal)

FEIN:      ████████

_On behalf of all Principals (if more than one)_

BY:      _[signature]_
_____

Name & Title      Cary Parks, President
_____

_CP_ _SP_ _RAH_ _MSB_

## INDEMNITOR(S) cont'd:

Corporate/Partnership Name: _____ (Seal) __

FEIN: _____
*On behalf of all Principals (if more than one)*

BY: _____

Name & Title _____

Corporate/Partnership Name: _____ (Seal) __

FEIN: _____
*On behalf of all Principals (if more than one)*

BY: _____

Name & Title _____

Name of Trust (if any): _____

BY: _____

Name & Title _____, trustee

BY: _____

Name & Title _____, trustee

Individual:

Signature: _____
Cary Parks

Name: _____

Social Security Number: ████████ _____

Individual:

Signature: _____
Susan Parks

Name: _____

Social Security Number: ████████ _____

Individual:

Signature: _____
Robert A. Hall

Name: _____

Social Security Number: ████████ _____

11

**INDEMNITOR(S) cont'd:**

Individual:

        Signature: _____

               Michael S. Brooks

        Name: _____

   Social Security Number: _____

Individual:

        Signature: _____

        Name: _____

   Social Security Number: _____

Individual:

        Signature: _____

        Name: _____

   Social Security Number: _____

*This Agreement must be signed is the presence of a Notary*
*and the Notary's Certificate of Acknowledgement must be attached*

**ARKANSAS INDIVIDUAL ACKNOWLEDGMENT**
16-47-107(b)

State of Arkansas

County of _Faulkner_ } ss.

On this _14_ day of _December_, 20_15_, before me, a Notary Public, appeared the within named
     *Day*          *Month*      *Year*

_____ _Cary Parks_ _____, to me
*Name(s) of Person(s) Acknowledging*

☐ personally well known   **— OR —**

☒ satisfactorily proven to be such person(s)

who stated and acknowledged that he/she/they had so
signed, executed, and delivered said foregoing instrument for
the consideration, uses, and purposes therein mentioned and
set forth.

IN TESTIMONY WHEREOF, I have hereunto set my hand and

official seal this _14th_ day of _December_, 20_15_.
               *Day*          *Month*      *Year*

_____
             *Signature of Notary Public*

**BRANDON J. LAR...**
**Comm. No. 126...**
**NOTARY**
**PUBLIC**
**FAULKNER CO., ARKANSAS**
**M...Exp. 09/0...**

*Place Notary Seal/Stamp Above*

--- ***OPTIONAL*** ---

*Though this section is optional, completing this information can deter alteration of the document
or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

© 2013 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)   Item #25947

**ARKANSAS INDIVIDUAL ACKNOWLEDGMENT**
16-47-107(b)

State of Arkansas
County of _Pulaski_ } ss.

On this _14th_ day of _December_, 20 _15_, before me, a Notary Public, appeared the within named
Day                    Month          Year
_____Susan_____Parks_____, to me
Name(s) of Person(s) Acknowledging

☑ personally well known   — OR —

☐ satisfactorily proven to be such person(s)

who stated and acknowledged that he/she/they had so signed, executed, and delivered said foregoing instrument for the consideration, uses, and purposes therein mentioned and set forth.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this _14th_ day of _December_, 20 _15_.
Day                    Month          Year

_____
Signature of Notary Public

Place Notary Seal/Stamp Above

——————————————— **OPTIONAL** ———————————————

*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _Bond   Indemnification_

Document Date: _12-14-15_                    Number of Pages: _____

Signer(s) Other Than Named Above: _____N/A_____

© 2013 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)  Item #25947

**ARKANSAS INDIVIDUAL ACKNOWLEDGMENT**
16-47-107(b)

State of Arkansas

County of _Pulaski_ } ss.

On this _16_ day of _December_, 20_15_, before me, a Notary Public, appeared the within named

_Robert A. Hall Sr._, to me

Name(s) of Person(s) Acknowledging

☑ personally well known   — OR —

☐ satisfactorily proven to be such person(s)

who stated and acknowledged that he/she/they had so signed, executed, and delivered said foregoing instrument for the consideration, uses, and purposes therein mentioned and set forth.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this _16_ day of _December_, 20_15_.

| | | |
|---|---|---|
| Day | Month | Year |

VERA M ANGEL
NOTARY PUBLIC
PULASKI COUNTY, ARKANSAS
COMM. EXP. FEBRUARY 19, 2022
COMMISSION NO. # 12686102

_Signature of Notary Public_

Place Notary Seal/Stamp Above

──────────── **OPTIONAL** ────────────

*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

© 2013 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)  Item #25947

**ARKANSAS INDIVIDUAL ACKNOWLEDGMENT**
**16-47-107(b)**

State of Arkansas
County of Faulkner }ss.

On this 14 day of December, 20 15, before me, a Notary Public, appeared the within named
_____ Michael Brooks _____, to me
*Name(s) of Person(s) Acknowledging*

☐ personally well known   — OR —

☒ satisfactorily proven to be such person(s)

who stated and acknowledged that he/she/they had so signed, executed, and delivered said foregoing instrument for the consideration, uses, and purposes therein mentioned and set forth.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this 14th day of December, 20 15.
*Day               Month               Year*

_____
*Signature of Notary Public*

*Place Notary Seal/Stamp Above*

———— **OPTIONAL** ————

*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _____

Document Date: _____  Number of Pages: _____

Signer(s) Other Than Named Above: _____

© 2013 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)   Item #25947

**Exhibit B**

**(Performance and Payment Bond Bond)**

Bon⌐ ⌐mber: S001-4952
Premium: $6,593.00

 2017012202

PRESENTED 02-24-2017 11 31 19 AM    RECORDED 02-24-2017 11 33 27 AM

In Official Records of Larry Crane Circuit/County Clerk

PULASKI CO, AR FEE $30.00

## PERFORMANCE AND PAYMENT BOND
### Section 00 61 13 / Rev: November 2015

1)   We _____ **CMM Mechanical, LLC** _____ , (Principal), and

_____Allied World Insurance Company_____ , (Surety), are held and firmly bound, jointly

and severally, unto _____ **DFA Division of Building Authority** _____ , as Obligee (Owner),
in the initial Contract amount of $ _____ 814,000.00 ____ said amount to be deemed a Performance
Bond payable to Owner and in the separate amount of $ _____ 814,000.00 ____ said amount to be
deemed a Payment Bond payable to proper claimants such amounts subject to the terms of this
Performance Bond and Payment Bond Agreement. The Principal and Surety state that the Surety
is a solvent corporate surety company authorized to do business in the State of Arkansas and is
listed on the current United States Department of Treasury's listing of approved sureties.

 Principal has by written agreement dated __Monday, February 20, 2017__ entered into a capital
improvement contract (Contract) with the Owner for:

North Boiler And Air Handling Units in 501 Building

  Project # _____ 6151609 .The above referenced Contract is incorporated herein by reference.

2)   Under this Performance Bond and Payment Bond Agreement, the Principal and Surety shall be
responsible for the following:

 a.   Performance Bond

  i. The Principal shall faithfully perform the above referenced Contract, which is incorporated
herein by reference.

  ii. In the event that the Principal defaults in its performance of its obligations under the
Contract, the Principal and the Surety, jointly and severally, shall indemnify and save
harmless the Owner from all cost and damage which the Owner may suffer by reason of
Principal's failure to perform the Contract. Said indemnification shall include, but not be
limited to, full reimbursement and repayment to the Owner for all outlays and expenses
which the Owner may incur in making good any such default of the Contract by the
Principal.

 b.   Payment Bond

  i. Principal shall pay all persons all indebtedness for labor or material furnished or
performed under the Contract and in doing so this obligation shall be null and void.

ii. In the event that Principal fails to pay for such indebtedness, such persons shall have a direct right of action against the Principal and Surety, jointly and severally, under this obligation, subject to the Owner's priority.

3) This Performance Bond and Payment Bond is given in accordance with Arkansas laws and rules, including Ark. Code Ann. § 18-44-501 et seq., §19-4-1401 et seq., and § 22-9-401 et seq. The Surety guarantees that the Principal shall comply with Ark. Code Ann. § 22-9-301 et seq. by payment and full compliance with all prevailing hourly wage contract provisions where the contract amount exceeds the amount provided by law.

Any changes made in the terms of the Contract, including but not limited to, the amount of the Contract, or in the work to be performed pursuant to the Contract or the giving by the Owner of any extension of time for the performance of the Contract, or any other forbearance on the part of either the Owner or the Principal to the other shall not in any way release the Principal and the Surety or Sureties or either or any of them, their heirs, personal representatives, successors or assigns from their liability hereunder, notice to and consent of the Surety or Sureties of any such change, extension or forbearance being are hereby voluntarily waived. In no event shall the aggregate liability of the Surety exceed the greater amount of the Contract, including DBA approved change orders.

This Performance Bond and Payment Bond Agreement is binding upon the above named parties, and their successors, heirs, assigns and personal representatives.

Executed by the parties who individually represent that each voluntarily enters into and has the authority to enter into this agreement.

CMM Mechanical, LLC

By: _____

Contractor's (Principal) Signature                                    Date

Allied World Insurance Company

By: _____            David Mahler, Attorney-In-Fact  2/23/17

Arkansas Resident Agent or Non-Resident Agent Signature (attach Power of Attorney     Date

7720682                                              19489
Agent's License Number                               Surety Company's NAIC Number

David Mahler                                         2/23/17
Print Agent's Name                                   Date

30 S. 17th St. Suite 810
Street Address

Philadelphia, Philadelphia PA 19103

City                    County                  State               Zip Code

(650) 274-0194 /  (866) 611-5499
Business Phone Number                                Fax Number



ALLIED WORLD INSURANCE COMPANY
30 S. 17th St, Suite 1600
Philadelphia, PA 19103
USA

# POWER OF ATTORNEY

Issue Date: October 6, 2016          No. 28650-A2395          Single Transaction Limit: $3,000,000

## KNOW ALL MEN BY THESE PRESENTS:

Allied World Insurance Company, a New Hampshire corporation (the "Company") does hereby appoint

NAME(s):     David Mahler                              David Druml

FIRM:     Druml Group, Inc. 1135 Farragut Boulevard  Foster City, CA 94404

Its true and lawful Attorney(s)-in-Fact, with full authority to execute on its behalf bonds, undertakings, recognizances and other contracts of indemnity and writings obligatory in the nature thereof, issued in the course of its business, and to bind the Company thereby. This Power of Attorney shall remain in full force and effect for one year from the issued date above-referenced and shall expire on close of business of the first anniversary of such Issue Date.

IN WITNESS WHEREOF,  ALLIED WORLD INSURANCE COMPANY has caused these presents to be executed by the officer named below, who is duly authorized and empowered to execute on the Company's behalf.
This 6th day of October, 2016

Name: Robert E. Staples
Title: Senior Vice President - Surety

State of Pennsylvania          )
County of Philadelphia          )ss.
On this 6th day of October, 2016, before me came the above-named officer of ALLIED WORLD INSURANCE COMPANY, to me personally known to be the individual and officer described herein, and acknowledged that he executed the foregoing instrument and affixed the seals of said corporation thereto by authority of his office.

Notary
My Commission Expires: 08/05/2018

## CERTIFICATE

Excerpt of Resolution adopted by the Board of Directors of the ALLIED WORLD INSURANCE COMPANY (the "Corporation"), on December 31, 2012:

RESOLVED, that the proper officers of the Corporation, the head of the surety business line for the Corporation and their appointed designees (each an "Authorized Officer" and collectively, the "Authorized Officers") be, and each hereby is, authorized to appoint one or more Attorneys-in-Fact to represent and act for and on behalf of the Corporation in the transaction of the Company's surety business to execute (under the common seal of the Corporation, if appropriate) bonds, undertakings, recognizances and other contracts of indemnity and writings obligatory in the nature thereof.

RESOLVED, that in connection with the Corporation's transaction of surety business, the signatures and attestations of the Authorized Officers and the seal of the Corporation may be affixed to any such Power of Attorney or to any certificate relating thereto by facsimile, and any such Power of Attorney or certificate bearing such facsimile signatures or facsimile seal shall be valid and binding upon the Corporation when so affixed with respect to any bond, undertaking, recognizance or other contract of indemnity or writing obligatory in the nature thereof.

RESOLVED, that in connection with the Corporation's transaction of surety business, the facsimile or mechanically reproduced signature of any Authorized Officer, whether made heretofore or hereafter, wherever appearing upon a copy of any Power of Attorney of the Corporation, with signatures affixed as next above noted, shall be valid and binding upon the Corporation with the same force and effect as though manually affixed.

RESOLVED, that in connection with the Corporation's transaction of surety business, any such Attorney-in-Fact delivering a secretarial or other certification that the foregoing resolutions still be in effect may insert in such certification the date thereof, said date to be not later than the date of delivery thereof by such Attorney-in-Fact.

RESOLVED, that the Authorized Officers be, and each hereby is, authorized to execute (under the common seal of the Corporation, if appropriate), make, file and deliver in the name and on behalf of the Corporation any and all consents, certificates, agreements, amendments, supplements, instruments and other documents whatsoever, and do any and all other things whatsoever in connection with the Corporation's transaction of surety business, as such Authorized Officer shall in his or her absolute discretion deem or determine appropriate and any of the foregoing resolutions, the transactions contemplated thereby and any ancillary matters thereto to carry out the purposes and intent thereof, such deeming or determination to be conclusively evidenced by any such execution or the taking of any such action by such Authorized Officer.

I, Daniel Zharkovky, Secretary of the ALLIED WORLD INSURANCE COMPANY, do hereby certify that the foregoing excerpts of Resolution adopted by the Board of Directors of this corporation, and the Power of Attorney issued pursuant thereto, are true and correct, and that both the Resolution and the Power of Attorney are in full force and effect.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the facsimile seal of the corporation, this 23rd day of February, 2017

Daniel Zharkovky, AVP, Assistant General Counsel

SUR 00046 00(05/2016)

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**                    CIVIL CODE § 1189

| |
|---|
| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |

State of California                               )
County of ___San Mateo_____             )

On ____February 23, 2017____ before me, _____Soy Wong, Notary Public_____,
            *Date*                             *Here Insert Name and Title of the Officer*

personally appeared ___David K. Mahler_____
                                    *Name(s) of Signer(s)*

_____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

SOY WONG
Commission # 2051554
Notary Public - California
San Mateo County
My Comm. Expires Dec 12, 2017

Signature _____
                        *Signature of Notary Public*

           *Place Notary Seal Above*

————————————————— **OPTIONAL** —————————————————
*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: _____ Document Date: _____
Number of Pages: _____ Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____          Signer's Name: _____
☐ Corporate Officer — Title(s): _____     ☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General                  ☐ Partner — ☐ Limited ☐ General
☐ Individual        ☐ Attorney in Fact             ☐ Individual        ☐ Attorney in Fact
☐ Trustee           ☐ Guardian or Conservator       ☐ Trustee           ☐ Guardian or Conservator
☐ Other: _____             ☐ Other: _____
Signer Is Representing: _____          Signer Is Representing: _____
_____                 _____

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)   Item #5907